Moreover, senior managers made their own requests for specific Euribor submissions that would benefit their trading positions and, at times, communicated with each other about their requested submissions.  For example:

August 7, 2007:
> Senior Rates Manager B:  "hi [Senior STIR Manager B], what you putting in for 3mth and 6mth euribor fixing today?"
> Senior STIR Manager B:  "goo[d] question ... need a low fix personally in 3s"
> Senior Rates Manager B:  "...i have a 2bn fixing today and i'm also looking to sell 1bn of the 6mth at about 4.42  fun times with the fixings at the moment"
> Senior STIR Manager B:  "i'll shoot for low then and hope some other do too and we dont fall out .."
> Senior Rates Manager B:  "if i don't sell the 6mth before the fix, i need a high fixing  3mth i'm now flat  over the next few weeks we've got a lot of 6mtth fixing coming off"
> Senior STIR Manager B:  "ill stick 4.42 in for 6s then"
> Senior Rates Manager B:  "we are receiving the fixing"
> Senior STIR Manager B:  "gotscha"

Multiple UBS Euro Derivatives Traders also occasionally made requests to the Euro Trader-Submitters for submissions that would benefit their derivatives trading positions.  The Euro Trader-Submitters agreed to the requests and solicited the Derivatives Traders for their preferences for submissions.  The Trader-Submitters took the specific requests into account when determining UBS's Euro LIBOR and Euribor submissions.

On June 25, 2009, more than eight months after the CFTC had launched its investigation of UBS and demanded information and documents from UBS in October 2008, a senior manager warned the Euro Derivatives Traders and the Trader-Submitters not to make requests for beneficial LIBOR and Euribor submissions on a "public chat."

June 25, 2009:  (Emphasis added.)
> Euro Trader-Submitter 1:  "u need low 3s and/or 6s?  we need low 6s ... boys, we send the fixings in about 1hr, so let us know pls"
> Euro Trader 1:  "low 6s high 12s please"
> Euro Trader-Submitter 1:  "noted"
> Rates Manager A:  "**JUST BE CAREFUL DUDE**"
> Euro Trader-Submitter 1:  "yeah [Sterling Trader-Submitter 1] gave me ur call update **i agree we shouldnt ve been talking about putting fixings for our positions on public chat** just wanted to get some transparency though  otherwise we end up with the same talks afterwards why we fixed it low or high, from u boys in ldn"

However, neither the UBS senior managers in the chat above nor any other UBS managers instructed UBS's Derivatives Traders and Trader-Submitters to stop the practice of taking into account trading positions.  Instead, the conduct continued unabated.  In fact, a written

40

request for a specific Euribor submission involving a senior STIR manager occurred as late as June 30, 2010.

### f.   By Such Conduct, UBS Made Knowingly False Reports

UBS, through its Derivatives Traders, Trader-Submitters and/or managers, knew it was improper to consider derivatives trading positions in determining the bank's benchmark interest rate submissions.  A bank's financial derivatives trading positions are not legitimate or permissible factors on which to base a bank's daily LIBOR, Euribor or Euroyen TIBOR submissions.  By basing its benchmark interest rate submissions on rates that benefited UBS's derivatives positions, UBS's submissions were not made in accordance with the BBA, EBF or JBA's definitions and criteria for benchmark interest rate submissions.  Instead, UBS knowingly conveyed false, misleading or knowingly inaccurate reports that its submitted rates for LIBOR, Euribor and Euroyen TIBOR were based on and solely reflected its assessment of the costs of borrowing unsecured funds in the relevant interbank money markets.  Accordingly, UBS regularly attempted to manipulate the official fixings of and knowingly delivered false, misleading or knowingly inaccurate reports concerning Yen LIBOR, Swiss Franc LIBOR, Sterling LIBOR, Euro LIBOR, Euribor and Euroyen TIBOR, which are all commodities in interstate commerce.

### 2.   During the Financial Crisis, UBS Made Submissions Based in Whole or in Part on Certain UBS Managers' Directions That Reflected Concerns for UBS's Reputation

During the financial crisis, commencing in early August 2007, certain managers of UBS's Group Treasury and ALM issued directions concerning the determination of its U.S. Dollar LIBOR and other benchmark interest rate submissions arising out of a concern of protecting UBS's reputation and avoiding what it perceived as unfair and inaccurate negative media speculation about UBS's fundraising ability and creditworthiness.[22]

The key directions were, at first, to "err on the low side" of the submissions of the panel banks, and, later, to make submissions in the "middle of the pack" of the panel banks.  Certain Group Treasury and ALM managers issued the broad directions without ascertaining or requiring the Trader-Submitters to ascertain the costs of borrowing unsecured funds in the relevant markets or ensuring that such directions were in accord with the definitions and criteria of the benchmark interest rates.  These Group Treasury and ALM managers did not provide any guidance to its submitters as to how to implement these directions, other than simply to follow them.  When the submitters followed the directions, they impacted UBS's submissions.  As a result, at times during the financial crisis, UBS's submissions did not accurately or solely reflect or relate to UBS's assessment of the costs of borrowing funds in the relevant interbank markets.[23]

---

[22]   UBS's directions also impacted other LIBOR submissions and its Euribor and Euroyen TIBOR submissions.

[23]   Consistent with UBS's lack of internal controls over its benchmark interest rate submissions, the Group Treasury and ALM managers did not have a formal role or supervisory responsibility over the

41

Prior to August 2007, LIBOR and other benchmark interest rates were generally steady day-to-day with little variance among the submissions from panel banks, which led to a relative predictability of benchmark interest rates. UBS's LIBOR submissions also were relatively stable. UBS's submissions for at least U.S. Dollar LIBOR were frequently included in the calculated average for the BBA's LIBOR fixings. With the onset of the financial crisis, liquidity in the London interbank market began to diminish dramatically and severe dislocations in the relevant unsecured cash markets developed. The media focused on the loss of liquidity in the markets and the financial well-being of the major financial institutions. The media analyzed LIBOR submissions, among other market indicators, to ascertain each panel bank's strength and ability to borrow funds. Questions arose in the media about the integrity of the panel banks' submissions.

The rapidly diminishing interbank transactions affected the panel banks' ability to make submissions. However, the panel banks were nonetheless required to adhere to the benchmark definition and criteria and submit rates based on their evaluation of the costs of borrowing unsecured funds in the interbank markets, namely, for LIBOR, the London interbank market. The definitions and criteria did not permit panel banks to base their submissions, in whole or in part, on a bank's desire to avoid negative media attention or reputational harm.

*The Beginning of the Financial Crisis – August 2007 through early April 2008: The "Err on the Low Side" Direction*

On August 9, 2007, Bloomberg published an article about rising LIBOR submissions for the overnight tenor entitled, "Lending Rates Rise, Overnight Dollar Surges." The Bloomberg article highlighted a 65-basis point jump in UBS's LIBOR submission for the overnight tenor from the prior day's submission, as well as similar jumps by other panel banks. The article suggested that the jump in LIBOR submissions reflected an elevation of bank borrowing costs as losses at banks mounted based on exposures to subprime mortgages. The article further suggested that a bank's borrowing costs reflected its creditworthiness relative to other panel banks.

Prior to the publication of the article, an inquiry from Bloomberg reverberated within UBS, causing concern as the press sought further comment from UBS and as UBS was to announce quarterly results the following week. In alerting senior Group Treasury members about the media inquiry, an employee commented, "Given that we are announcing our results next week this will need urgent attention."

UBS concluded that the 65-basis point spike in its U.S. Dollar overnight LIBOR submission was the result of an error. On August 9, 2007, the same day as the Bloomberg

---

LIBOR submissions; yet, as set forth above, they became part of the process and at times had an impact on UBS's submissions.

article, an ALM manager sent the following direction by email to senior managers and others in UBS's Group Treasury and derivatives trading divisions:[24]

> "After the happenings of today with the [overnight] Libor fixings, can you pls advise whoever contributes fixings on the rates derivs side to co-ordinate the numbers with the STIR desk in Zurich. **It is highly advisable to err on the low side with fixings for the time being to protect our franchise in these sensitive markets. Fixing risk and PNL thereof is secondary priority for now."**

(Emphasis added). This direction stemmed from a desire to ensure that UBS's LIBOR submissions did not convey to the media or market what UBS believed to be an inaccurate message about UBS's financial stability or otherwise harm UBS's reputation in the increasingly uncertain environment created by the financial crisis. The idea was that, going forward, UBS's submissions were to portray a view that UBS was more creditworthy than other panel banks and, therefore, UBS should not make higher submissions and be an outlier as compared to other panel banks. Neither Group Treasury nor ALM managers took any steps to ensure that the "err on the low side" direction for making LIBOR submissions complied with the BBA's definition and criteria for making LIBOR submissions or that it related to UBS's costs of borrowing in the London interbank market.[25]

UBS promptly disseminated the direction to err on the low side. That same day, August 9, Rates Manager A confirmed that the necessary coordination was in place: "We have already co-ordinated our efforts with [Senior Rates/STIR Manager] and [U.S. Dollar Trader-Submitter 1] on the usd libors will be speaking to [U.S. Dollar Trader 1] and [Euro Trader 1] will be liaising with [Senior STIR Manager B] on the eurolibors before our numbers are input." U.S. Dollar Trader 1 in Zurich and U.S. Dollar Trader-Submitter 1 in London discussed the "err on the low side" direction, and their submissions immediately started reflecting the directions. For example, on August 10, 2007, the traders had the following communication:

---

[24]   During this time, UBS's U.S. Dollar LIBOR submissions were made by a U.S. Dollar swaps trader ("U.S. Dollar Trader-Submitter 1") who traded medium tenor derivatives. Prior to August 9, 2007, UBS did not provide the Trader-Submitter with access to UBS's money market transactions or other information about UBS's costs of borrowing. Following the August 9, 2007 direction, a U.S. Dollar Stir Trader provided U.S. Dollar Trader-Submitter 1 with the rates he should submit for the short end tenors.

[25]   The email's last sentence also reflects that UBS's Trader-Submitters otherwise were taking into account UBS's risk and profits and losses of UBS's derivatives trading positions in making UBS's submissions. Here, this senior manager was directing that the franchise protection concerns trumped those other improper considerations. However, as noted herein and as demonstrated by the numerous examples of Derivatives Traders and Trader-Submitters communications set forth above, UBS's Trader-Submitters continued to regularly account for UBS's derivatives trading positions in the determination of its submissions throughout the financial crisis, as they had before and would do so after.

43

> U.S. Dollar Trader 1: "o;/n just trading way lower . . . so I would go for a pretty low run . . . **aim should really be to be on the lower side of range"**
>
> U.S. Dollar Trader-Submitter 1: "just looking for early indications for o/n 1w and 2wks – understand mkt dropping fast – so early indics for now then true [levels] at 11 am – pls"
>
> U.S. Dollar Trader 1: "o/n would go for 5.70 . . . 1wk 5.70 . . . 2wk 5.60 . . . **this seems probably a tad low right now, but recon thats what we should try to be"**
>
> U.S. Dollar Trader-Submitter 1: **"kk — will check back at 11[when the submissions had to be made] — as you say always want to err on the low side** - thks for colour - may even swap ideas about 1m 2m and 3 mo with you too in curect climate - sure few weeks down the road then will only need to chat about v short dates ie <1mo - appreciate colour"
>
> U.S. Dollar Trader 1: "np at all . . . we just dont want to give the market a wrong impression . . . we not struggling to get cash . . . so therefore dont want to be on the highs of libors"
>
> (Emphasis added.)

A few days later, on August 14, 2007, U.S. Dollar Trader 1 confirmed again, "my indications are deliberately on the low side…" and U.S. Dollar Trader-Submitter 1 agreed, "y[es] pls err on the side of caution as before – once teh mkt normalises…then we can adj accordingly…."

On September 3, 2007, U.S. Dollar Trader 1 explained to an ALM Manager his understanding of why UBS wanted to "err on the low side," stating that UBS did not want "to be seen to pay higher or at libor in the market to avoid trouble." On September 5, 2007, U.S. Dollar Trader-Submitter 1 explained he was following the "err on the low side" direction to his supervisor, Senior Rates Manager C:

> "fyi libor has been fuctioning well for many years - current turbulance and american home owners exposure to libor may trigger further questions - since the mkt dislocation I am now keeping a record of UBS libor fixings vs the implied rates - **we are fixing on the low side of all other banks in the libor panel in the 4- 12 mo period by several bps** - and we are still fixing 12 - 15 over implied rates - **I can justify my fixings each day if asked** - I se longer dated libors even lower however the rest of he mkt continue to call libors higher than UBS - **we should be protected from moral hazard as a bank. Short rates coming grom Zurich now - again asa bank we are erring on the low side."**

(Emphasis added.)[26] As noted above, this particular Trader-Submitter never had direct access to information about UBS's actual costs of borrowing unsecured funds in the relevant market for U.S. Dollar LIBOR.

---

[26]   On the same day, after Derivatives Broker A1 commented on how low UBS was on the Yen LIBOR fixes, stating, "you are conspicuous by how low you are on the fixes now..2bps below the lowest and about 5bps below the norm! … I take it [Senior Yen Trader-Submitter] is the other way", the UBS Senior Yen Trader responded, **"no is all senior mngment mate  want to show the world we are the strongest**

Thereafter, UBS managers monitored how UBS's LIBOR submissions sent signals to the markets and the press about UBS's ability to obtain funds. At this time, as part of their daily internal calls about liquidity and funding as the financial crisis intensified, UBS managers received internal analyses about UBS's LIBOR submissions relative to other panel banks. Specifically, UBS ALM Manager A circulated spreadsheets about the panel banks' submissions for U.S. Dollar, Euro, Sterling, Swiss Franc and Yen LIBOR, showing how UBS compared to the other banks. For example, in an email on September 4, 2007, ALM Manager A wrote, "For those interested, this new tool shows where each bank on the Libor fixing panel quoted their offer level in today's fixing. Should give some insights into the funding situation at our peers. Note Barclays are consistently amongst the highest contributors and UBS are often the lowest." On September 10, 2007, the same person commented, "we're still contribute the lowest rates in most currencies." Notably, the spreadsheets and "tools" provided to the managers did not include information about UBS's actual transactions in the relevant unsecured interbank cash markets or any other information relating to costs of borrowing in those markets.

The "err on the low side" direction generally applied to UBS's U.S. Dollar LIBOR submissions for the rest of 2007, as reflected in communications between U.S. Dollar Trader 1 and U.S. Dollar Trader-Submitter 1, such as the following:

> November 5, 2007:
> U.S. Dollar Trader 1:   "I left 2s and 3s a tad on low side just not to stir any additional"
> U.S. Dollar Trader-Submitter 1:   "great - do appreciate your input each day"
> U.S. Dollar Trader 1:   "but I have been on lower end def"
> U.S. Dollar Trader-Submitter 1:   "I know - I am same with 4mo - out -"
> U.S. Dollar Trader 1:   "ok perfect"
> U.S. Dollar Trader-Submitter 1:   "we are towards to lower end across the board"
> U.S. Dollar Trader 1:   "yep we are"[27]

---

bank with loads of liquidity  we'd lend at 0 us!  has been a lot of media focus on Barclays libor fixes so they are paranoid..." (Emphasis added.)

[27] The "err on the low side" direction did not deter certain Derivatives Traders trying to benefit their trading positions with higher submissions. On November 30, 2007, U.S. Dollar Trader 1, when providing the rates to be submitted under Group Treasury's instruction, told U.S. Dollar Trader-Submitter 1, "go 5.18 ( will be low) if you have exposure, let me know, happy to go a bit higher." On December 11, 2007, the Yen Desk Manager, asked for relief from Group Treasury's instructions and questioned what was in the best interests of UBS in making its LIBOR submissions – maximizing its profit or concern for its reputation:

> "Currently, we are in the bottom quartile. A move into the middle is worth 500k. **There is some reluctance on their part to move it higher as they are concerned about the reputational risks of putting in a high fix.** I'd agree with this if we were to set in the top quartile that may be the case, but I don't think anyone's really got their eye on UBS's 3m yen fix. If our position is bigger then [STIR], we should be doing what's best for the bank...."

November 23, 2007:

> U.S. Dollar Trader 1:  "again... we are probably low 1-3month..."
> U.S. Dollar Trader-Submitter 2:  "y but 7 bp?"
> U.S. Dollar Trader 1:  "well [U.S. Dollar Bank A] is constantly lower than us i am happy to move em up to 4.99 the 2s and 3s  the 1s is ok  its about 2 [bp]."
> U.S. Dollar Trader-Submitter 2:  "3 month is about m5.045  so that is like 6.5 bp away"
> U.S. Dollar Trader 1:  "04 ist the last I heard ... I mean agree... 4.99 is probably low  we can go to 5.00 ... but there are other people on the  other side of the extrem in my opinion"
> U.S. Dollar Trader-Submitter 2:  "i see where u are coming from  ok will show 5"
> U.S. Dollar Trader 1:  "ok cheers."

UBS's submissions moved to the lowest quartile of the panel submissions almost immediately after the issuance of the August 9, 2007 direction and, in some tenors, often remained in the lowest quartile for the rest of the year and through March 2008.  In fact, UBS remained on the "low side" of the submissions, despite reporting two significant write-downs of assets in late 2007.  On October 1, 2007, UBS reported it would record negative revenues of approximately $3.42 billion in its Fixed Income business and then on December 10, 2007, UBS reported a $10 billion write-down of assets.

UBS's drop to the "low side" is evidenced by the marked increase in the percentage of instances after August 9 when UBS's submissions were excluded from the BBA's U.S. Dollar LIBOR fixing for each of the key one, three, six and twelve-month tenors because UBS's submissions were in the lowest quartile of all sixteen banks, as reflected in the following chart:

Percentage of UBS's Submissions in the Lowest Quartile

|  | January 1,2007 to August 9, 2007 | August 10, 2007 to March 31, 2008 |
|---|---|---|
| **1-month tenor** | 3% | 39% |
| **3-month tenor** | 16% | 47% |
| **6-month tenor** | 42% | 77% |
| **12-month tenor** | 22% | 67% |

By the spring of 2008, UBS's financial position began to worsen significantly, impacting its ability to borrow unsecured funds in the relevant interbank markets.  On April 1, 2008, UBS announced a net loss of approximately 12 billion Swiss Francs for the first quarter of 2008, attributable to approximately $19 billion lost on U.S. real estate and related "structured credit positions."  UBS also announced it was seeking shareholder approval of a 15 billion Swiss Franc increase in share capital underwritten by a syndicate of banks, including JP Morgan Chase Bank ("JP Morgan").  That same day, Moody's Investor Service ("Moody's") downgraded UBS's

---

(Emphasis added.)  He emphasized a few days later that UBS had the ability to impact the fixing in its favor: "(The yen fix is 16 banks, of which the top and bottom four are excluded.  This leaves 8 banks that determine the fix.  Our rate input can make a significant difference)."

credit rating from "Aaa" to "Aa1," noting that a further downgrade was possible.  Other rating agencies also downgraded UBS.  At the same time, UBS's costs of borrowing funds were rising.  Nevertheless, despite these events and conditions, the "err on the low side" direction remained in place into mid-April 2008.

*April-May 2008: The "Middle of the Pack" Direction*

As the financial crisis deepened, the press scrutiny of banks' LIBOR submissions increased.  Around this time, on April 10, 2008, certain UBS managers, involved in the issuance and implementation of the directions commented on the impact that Group Treasury was having on LIBOR submissions.

> Rates Manager A:  "… here is a mind fuck for you  if we are doing CP at 2.81% and that is 3m usd libor + 10 why arent we putting our 3m rate in at 2.81% for libors"
> ALM Manager B:  "we should"
> Rates Manager A:  "but then GT will rip our boys a new one for being the highest bank in the poll"
> ALM Manager B:  "you can't win…"

That same day, a U.S. Dollar Trader involved in the LIBOR submission process commented to Rates Manager A that "libors have totally de-linked with real cash markets … the libors have become a total joke … and certainly no reflection of the cash market."  Rates Manager A noted that a higher LIBOR would have "GT chewing your head off," and the U.S. Dollar Trader responded: "we got clapped our fingers back in august when we put high libors in yep  GT is the one."

On April 16, 2008, the WSJ published an article entitled, "LIBOR Fog Bankers Cast Doubt on Key Rate Amid Crisis."  The article stated the concern that "[s]ome banks don't want to report the high rates they are paying for short-term loans because they don't want to tip off the market that they're desperate for cash."  That same day, ALM Manager B and Rates Manager A discussed the WSJ article, noting that UBS was funding at rates higher than the LIBOR fixing and that the article might increase the scrutiny of banks' LIBOR submissions:

> Rates Manager A:  "…great article in the WSJ today about the libor problem"
> ALM Manager B:  "…we issue way above libor in usd…"
> Rates Manager A:  "…rumour BBA denying the earlier story…this turn of events is very interesting it forces transparency"
> ALM Manager B:  "y, the central banks and the regulators have us by our balls these days…pull your pants down"

Thereafter, Group Treasury and ALM issued a new direction for submissions to be higher, specifically in the "middle of the pack" of sixteen panel banks.  On April 17, the day following the WSJ article, UBS and most other panel banks dramatically raised their LIBOR submissions.  UBS's one-month tenor submission increased by eight basis points, the three-month by nine and a half basis points, the six-month by fifteen basis points, and the twelve-

month by eighteen basis points, placing UBS's submissions in the middle eight of the panel banks and thus included in the calculation of the LIBOR fixings. That day, U.S. Dollar Trader 1 told U.S. Dollar Trader-Submitter 1: "the guidance I got from my management with regards to libors is that **we should aim to be in the middle of the pack** they also want to see the levels we are posting trough [sic] the hole [sic] curve. **(they got GT on their back again as well)**." (Emphasis added.) On April 18, ALM Manager A informed other senior managers: "With 18 April levels. As you can see another big increase in USD Libors (1M +7.4; 3M +9.0; 6M +13.7; 12M +15.6) **and UBS again in the middle of the pack.**" (Emphasis added.)

On April 22, 2008, a senior Group Treasury manager ("Group Treasury Senior Manager") in Stamford, Connecticut, determined that UBS's LIBOR submissions were "lagging the panel and peer banks" and therefore decided to adjust UBS's submissions upward towards its CP/CD issuance levels. The Group Treasury Senior Manager apparently believed, incorrectly, that LIBOR served as an "advertisement" of the rate that UBS would pay for funds, and not the rate at which UBS could borrow funds in the London interbank market. As a result, he was purportedly concerned that UBS's LIBOR submissions were not competitive and should more closely reflect the bank's issuance rates for CP/CDs to attract potential clients. That same day, ALM Manager B informed other senior managers and the traders primarily responsible for the U.S. Dollar LIBOR submissions:

> "[Group Treasury Senior Manager] requested today that we fix our libors in $ a few bps higher going fwd, as we still fix below where we post issuance. I went through the other banks that issue and are on the libor panel, and only [U.S. Dollar Bank B] fixes lower than where they post issuance (same as UBS). Suggest we hike our fixings 2-3 bps out to 6 month and 4-5 bps out to 1 year, and we will still not be the highest fixing. You ok with that?"

After receiving this new direction, U.S. Dollar Trader 1 commented to U.S. Dollar Trader-Submitter 1: "that libor setting is getting a bit of a joke...they seem to want us to fix higher again cause they issue higher."

ALM Manager B made sure that the new revised direction was followed. For example, upon hearing that the U.S. Dollar Trader-Submitter 1 was resisting some of the directed submissions and had commented "since its my name on the libor fixings then I will fix them appropriately...," ALM Manager B stated "...he'll go with our levels." This revised direction appears to have been in place and followed from approximately late April to June 1, 2008.

On May 21, 2008, UBS received an inquiry from a WSJ reporter who was preparing an article concerning LIBOR. The reporter asked, "...it is now my understanding that UBS was willing to pay 2.85% to sell three-month commercial paper in mid-April. However, this was some 12 basis points above the Libor rate UBS quoted on April 16 for the three-month dollar rate of 2.73%. Can UBS explain why it was paying 12 basis points for CP more than it was posting as a Libor quote?" This press inquiry was elevated to the highest levels of UBS's Group Treasury, who remained concerned about the signals that UBS's LIBOR submissions sent to the market. During discussions about a potential response to the WSJ, ALM Manager B frankly stated that: **"the answer would be 'because the whole street was doing the same and because**

**we did not want to be an outlier in the libor fixings, just like everybody else' ...."** (Emphasis added.)

The WSJ article, which ran on May 29, 2008, focused on UBS and other banks, and indicated that UBS's LIBOR submissions were significantly lower than where other market measures indicated that they should have been.  Consistent with the inquiry to UBS on May 21, the WSJ reported that "[i]n mid-April, UBS, which has suffered some $38 billion in write-downs on investments gone bad, was offering to pay an annual rate of about 2.85% to borrow dollars for three months in the commercial-paper market, according to a person familiar with the matter.  But when it reported for LIBOR on April 16, UBS said it could borrow for three months from other banks at 2.73%--in line with all the other panel banks.  A UBS spokesperson declined to comment."

*Early June 2008: Direction to More Closely Track CP/CD Rates, Rendering UBS an Outlier*

On May 30, Rates Manager A, UBS's representative on the BBA's Foreign Exchange and Money Markets ("FX/MM") Committee, reported his understanding that BBA supported panel banks using CP/CD rates to determine LIBOR submissions.  As a result of these factors, UBS began to incrementally move its submissions closer to UBS's CP/CD rates, even if those rates were high, and even if the submissions placed UBS out of the middle of the pack.

On June 2, 2008, UBS's U.S. Dollar Trader-Submitter 3 in Zurich confirmed to U.S. Dollar Trader-Submitter 1 that they were being told to track CP/CD issuance rates in their LIBOR submissions: "just had to run it through with alm desk...here is what they have come up with...o/n 2.28, 1w 2.36, 2wk 2.36, 1m 2.405, 2m 2.54, 3m 2.65, 4m 2.74, 5m 2.82, 6m 2.90, 9m 3.03, 1y 3.16  **(thats very diff from what we would hv set)** as it is following more closely to where issuance is being done."[28]  (Emphasis added.)

---

[28]  On June 2, 2008, the Rates and ALM managers again expressly recognized the issues surrounding the LIBOR submission process and the role of Group Treasury in UBS's LIBOR submissions, including whether Group Treasury would acknowledge its role:

> Rates Manager A:  "this libor submissions thing is gaining speed the Fed and the BBA are doing a thorough investigation...you know GT will wash their hands of any involvement"
> ALM Manager B:  "just what we needed  of course  as always"
> Rates Manager A:  "i will be vocal if anyone in FXMM or Rates gets pulled aside for that very vocal in fact"
> ALM Manager B:  "a gun might be loud enough..."

On the same day, U.S. Dollar Trader-Submitter 1 made the following comments in a UBS group chat to the U.S. Dollar Trader-Submitter 3:

> U.S. Dollar Trader-Submitter 1:  "will be interesting to see - all we can keep doing is keep being  as fair and as honest as possible - have re read the BBA libor defintions and we continue to be in lne with their letter and spirit, however they do leave room for interpretation."

49

Over the next two weeks in June, UBS concluded that it was the only bank apparently trying to base its LIBOR submissions on its CP/CD issuance rates after the FX/MM Committee meeting. As ALM Manager A wrote to Group Treasury, "it seems we're the only bank trying to even move in that direction."

When UBS adjusted its submissions closer to its CP/CD issuance levels, it became a somewhat high outlier on the U.S. Dollar LIBOR panel. During the two weeks up to June 16, 2008, for the one, three, six and twelve-month tenors in U.S. Dollar LIBOR, UBS rose from being in the lowest quartile or the middle of the pack to being in the highest quartile of submitting banks, and was therefore excluded from the calculation of the U.S. Dollar LIBOR fixings.

*June 17, 2008 through 2009: UBS Returns to the "Middle of the Pack" Direction*

By June 17, 2008, in reaction to being a high outlier on the U.S. Dollar panel, UBS decided to return to the "middle of the pack." On that day, Senior STIR Manager C went to the trading floor in Zurich and directed that UBS's LIBOR submissions be lowered so that UBS would be in "the middle of the pack" of the submitting banks.

That day, U.S. Dollar Trader-Submitter 3 discussed with ALM Manager B the need to implement the "middle of the pack" direction quickly and that the "middle of the pack" direction would be in place "until further notice:"

> U.S. Dollar Trader-Submitter 3: "just spoke to [U.S. Dollar Trader-Submitter 1 in London]…**we will start lowering over the next few days to get to more or less middle of the pack until further notice** did you need me for anything else?"
> ALM Manager B: "nope that was it, thx **we should bring it down fast so we are in line by friday with the pack…**"
> U.S. Dollar Trader-Submitter 3: "we will get there by friday"
> ALM Manager B: "and out to 6m you can be in line tomorrow"
> U.S. Dollar Trader-Submitter 3: "sure"
> (Emphasis added.)

The next day, June 18, U.S. Dollar Trader-Submitter 3 explained the revised direction to U.S. Dollar Trader-Submitter 1, confirming that Senior STIR Manager C was the source of this direction and that the proposed LIBOR submissions were "instructions" from ALM. U.S. Dollar Trader-Submitter 1 expressed frustration with media scrutiny:

> U.S. Dollar Trader-Submitter 3: "i think its been good we bounce the levels off each other"
> U.S. Dollar Trader-Submitter 1: "so many interested parties and hidden agendas out there - fro mthe press to hedge funds to home owners - 100% agree about boucing thoughts and ideas of each other - so frustration when all we have tried to be is honest and transparent and you still get attached in the press - it is so much in our interest that libor is 'accurate'"

U.S. Dollar Trader-Submitter 3: **"its with him [ALM Manager A] and [ALM Manager B] i get the instructions how we want to set"**
U.S. Dollar Trader-Submitter 1: "understand"
U.S. Dollar Trader-Submitter 3: "didnt like that comment very much . . . **and of all the days today we fixed lower"**
U.S. Dollar Trader-Submitter 1: **"it is wrong -** however it is a conclusion which will be reached by others . . . we are still 10 bps over the competition . . . in the 12mo"
U.S. Dollar Trader-Submitter 3: "yeah **but they want us to get in line with competition by Friday"**
U.S. Dollar Trader-Submitter 1: **"who is the they ?"**
U.S. Dollar Trader-Submitter 3: **"[Senior STIR Manager C] gave instructions to alm** . . . i will discuss with alm"
U.S. Dollar Trader-Submitter 1: "we should be consistent"
. . .
U.S. Dollar Trader-Submitter 3: "i sent [Senior STIR Manager C] and alm that comment . . . will discuss with alm when there are some bodies abt"
. . .
U.S. Dollar Trader-Submitter 1: **"if you are too low you get written about for being too low if you are too high you get writen about for being too high"**
U.S. Dollar Trader-Submitter 3: **"middle of the pack there is no issue"**
U.S. Dollar Trader-Submitter 1: "and if you are in line with the crowd you get wrtiine about because the crowd is too low"
U.S. Dollar Trader-Submitter 3: "thats why for a long time we were in the middle of the pack and only after [Rates Manager A]'s meeting with bba did we start moving towards our issuance level"
U.S. Dollar Trader-Submitter 1: "understand reasonnig behind the move"
U.S. Dollar Trader-Submitter 3: "me too. just surprised others didnt interpret it like that"
U.S. Dollar Trader-Submitter 1: "again there is no 'right' answer -- which think is what the press does not like"
(Emphasis added.)

From June 17 through December 2008, UBS was in middle of the pack virtually every day, with very little deviation in its submissions.[29] UBS remained in the middle of the pack even after October 16, when it received approximately $59 billion in funds from the Swiss government and the Swiss National Bank and borrowed over $77 billion from the various liquidity programs of the Federal Reserve Bank.[30] UBS continued to submit in the middle of the

---

[29]   U.S. Dollar Trader-Submitter 3 made sure in December 2008 that the back-up submitter adhered to the direction in her absence: "We want our fixings to be roughly in the middle of the pack."

[30]   In October 2008, UBS's implementation of the "middle of the pack" direction in Yen LIBOR again conflicted with the Senior Yen Trader's efforts to use UBS's Yen LIBOR submissions to skew the BBA's Yen LIBOR fixings in favor of his derivatives trading positions.  On October 8, 2008, the Yen Desk Manager asked Senior Rates Manager C for relief from the Group Treasury direction:

pack throughout at least the first half of 2009, despite UBS's February 10, 2009 announcement of an 8.1 billion Swiss Franc loss for the fourth quarter of 2008.

UBS, through its managers, Derivatives Traders and Trader-Submitters, knew that concerns about reputation or perceived inaccurate negative market or press reports were not legitimate or permissible factors on which to base their daily LIBOR and other benchmark interest rate submissions. Yet, during the financial crisis, UBS at times made its U.S. Dollar LIBOR submissions and other benchmark interest rate submissions in accordance with Group Treasury and ALM managers' directions, and not in accordance with the relevant definitions and criteria for those rates. These submissions based in whole or in part on these considerations were knowingly false because such submissions did not reflect solely UBS's assessment of the costs of borrowing unsecured funds in the relevant interbank market at that time. Accordingly, UBS at times, through its submissions, knowingly delivered, or caused to be delivered, benchmark interest rate submissions that constituted false, misleading or knowingly inaccurate reports that affected or tended to affect LIBOR, Euribor or Euroyen TIBOR, all commodities in interstate commerce.

## IV.

## LEGAL DISCUSSION

**A.    UBS Made False, Misleading or Knowingly Inaccurate Reports Concerning the Costs of Borrowing Unsecured Funds in Violation of Section 9(a)(2) of the Act**

Section 9(a)(2) of the Act makes it unlawful for any person "knowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce . . . ." 7 U.S.C. § 13(a)(2) (2006); *U.S. v. Brooks*, No. 09-20871, 2012 WL 1768061, *691 (5th Cir. May 18, 2012); *United States v. Valencia*, 394 F.3d 352, 354-355 (5th Cir. 2004); see also *CFTC v. Johnson*, 408 F. Supp. 2d 259, 267 (S.D. Tex. 2005) (same).

On a daily basis, UBS, through the transmission of an electronic spreadsheet to the service provider of the BBA, EBF and JBA who calculates their official fixings (*e.g.*, Thomson Reuters), knowingly delivered or caused to be delivered its U.S. Dollar, Swiss Franc, Sterling,

---

"We have a large tibor/libor position which loses if libors move higher. 4mio/bp **Group treasury has informed Stir to put all fixings in the middle of the pack.** This has resulted in UBS personally contributing to a 1/2bp higher fixing today. **Last year when we wanted Libors higher, we were told our fixing had to be low to show UBS's comparitive strength.** Now there are 7 banks showing lower fixes than us in 3m yen. How do I get some focus on this?"

(Emphasis added.)

Euro and Yen LIBOR, Euribor and Euroyen TIBOR submissions through the mails or interstate commerce. UBS's submissions were also caused to be delivered through the mails or interstate commerce through the daily dissemination and publication globally, including into the United States, of the panel banks' submissions as well as the daily official benchmark interest rates by at least Thomson Reuters on behalf of the BBA, EBF and JBA, and other third party vendors. The panel banks' submissions are used to determine the official published rates for LIBOR, Euribor and Euroyen TIBOR, which are calculated based on a trimmed average of the submissions. UBS's daily LIBOR, Euribor and Euroyen TIBOR submissions contained market information concerning the costs of borrowing unsecured funds in particular currencies and tenors, the liquidity conditions and stress in the money markets, and UBS's ability to borrow funds in the particular markets. Such market information affects or tends to affect the prices of commodities in interstate commerce, including the daily rates at which U.S. Dollar, Swiss Franc, Sterling, Euro and Yen LIBOR, Euribor and Euroyen TIBOR are fixed.

During the periods relevant to the conduct described herein, UBS's submissions for LIBOR for Swiss Franc, Sterling, Euro, Yen and U.S. Dollar, Euribor and Euroyen TIBOR were false, misleading or knowingly inaccurate because they were based in whole or in part on impermissible and illegitimate factors, specifically: (1) the derivatives positions of traders, which occurred routinely, and at least for certain currencies and periods, daily; and/or (2) at times during the financial crisis commencing in early August 2007, UBS's Group Treasury and ALM managers' directions that UBS's submissions be either on the low side or in the middle of the pack of the panel bank submissions to manage market and media perceptions of UBS and protect its reputation. By using these impermissible and illegitimate factors in making its LIBOR, Euribor and Euroyen TIBOR submissions, UBS conveyed false, misleading or knowingly inaccurate information that the rates it submitted were based on and related solely to the costs of borrowing unsecured funds in the relevant markets and were truthful and reliable. Certain of UBS's managers, traders and submitters knew that certain UBS's LIBOR, Euribor and Euroyen TIBOR submissions contained false, misleading and knowingly inaccurate information concerning the submitted rates. By such conduct, Respondents violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2) (2006).

## B.   UBS Manipulated Yen LIBOR at Times for Certain Tenors

Together, Sections 6(c), 6(d), and 9(a)(2) of the Act prohibit acts of manipulation or attempted manipulation. Section 9(a)(2) of the Act makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity . . . ." 7 U.S.C. § 13(a)(2) (2006). Section 6(c) of the Act authorizes the Commission to serve a complaint and provide for the imposition of, among other things, civil monetary penalties and cease and desist orders if the Commission "has reason to believe that any person ... is manipulating or attempting to manipulate or has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, ... or otherwise is violating or has violated any of the provisions of [the] Act . . . ." 7 U.S.C. § 9 (2006). Section 6(d) of the Act is substantially identical to Section 6(c). See 7 U.S.C. § 13b (2006).

Manipulation under the Act is the "intentional exaction of a price determined by forces other than supply or demand." *Frey v. CFTC*, 931 F.2d 1171, 1175 (7th Cir. 1991). The following four elements must be met, by a preponderance of the evidence, to show a successful manipulation has occurred:

> (1) the [respondent] had the ability to influence market prices;
> (2) the [respondent] specifically intended to do so;
> (3) artificial prices existed; and
> (4) the [respondent] caused an artificial price.

*In re Cox*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 23,786 at 34,061 (CFTC July 15, 1987). The test for manipulation, however, is a practical one:

> We think the test of manipulation must largely be a practical one if the purposes of the Commodity Exchange Act are to be accomplished. The methods and techniques of manipulation are limited only the ingenuity of man. The aim must be therefore to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand.

*Cargill v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971).

"[I]ntent is the essence of manipulation." *Indiana Farm Bureau Cooperative Ass'n, Inc.*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep (CCH) ¶ 21,796, at 27,282 (CFTC Dec. 17, 1982). The manipulator's intent separates "lawful business conduct from unlawful manipulative activity." *Id.* at 27,283. To prove the intent element of manipulation, it must be shown that UBS "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *Id.*

The Commission has observed that "intent must of necessity be inferred from the objective facts and may, of course, be inferred by a person's actions and the totality of the circumstances." *In re Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271 at 21,477 (CFTC Feb. 18, 1977). "[O]nce it is demonstrated that the alleged manipulator sought, by act or omission, to move the market away from the equilibrium or efficient price – the price which reflects market forces of supply and demand – the mental element of manipulation may be inferred." *Indiana Farm Bureau*, (CCH) ¶ 21,796 at 27,283. "It is enough to present evidence from which it may reasonably be inferred that the accused 'consciously desire[d] that result, whatever the likelihood of that result happening from his conduct.'" *Id.* (quoting *U.S. v. United States Gypsum Co.*, 438 U.S. 442, 445 (1978)). A profit motive may also be evidence of intent, although profit motive is not a necessary element of an attempted manipulation. *See In re DiPlacido* [2007-2009 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 30,970, at 62,484 (CFTC Nov. 5, 2008) (citing *In re Hohenberg Bros. Co.*, (CCH) ¶20,271, at 21,478)), *aff'd*, 364 Fed. Appx. 657, No. 08-5559-ag, 2009 WL 3326624 (2d Cir. 2009).

An artificial price (also termed a "distorted" price) is one "that does not reflect market or economic forces of supply and demand." *Cox*, ¶ 23,786 at 34,064; *Indiana Farm Bureau*, ¶

21,796 at 27,288 n. 2.  As the Commission noted with approval in *DiPlacido*, ¶ 30,970, at 62,484 (quoting *Indiana Farm Bureau*, ¶ 21,796 at 27,300 (Commissioner Stone concurring)), a Commissioner has commented: "[t]his is more an axiom than a test."  In determining whether an artificial price has occurred:

> [O]ne must look at the aggregate forces of supply and demand and search for those factors which are extraneous to the pricing system, are not a legitimate part of the economic pricing of the commodity, or are extrinsic to that commodity market.  When the aggregate forces of supply and demand bearing down on a particular market are all legitimate, it follows that the price will not be artificial.  On the other hand when a price is effected by a factor which is not legitimate, the resulting price is necessarily artificial.  Thus, the focus should not be as much on the ultimate price as on the nature of the factors causing it.

*Indiana Farm Bureau*, ¶ 21,796 at 27,288 n. 2.  *See also DiPlacido*, ¶ 30,970 at 62,484 (finding that the placement of uneconomic bids or offers results in artificial prices because those prices are not determined by the free forces of supply and demand on the exchange").

Causation of artificial prices is established when it is demonstrated that artificial market prices resulted from the conduct of a trader, or group of traders acting in concert, rather than legitimate forces of supply and demand.  *See Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1171-72 (8th Cir. 1971) (price squeeze "intentionally brought about and exploited by Cargill"); *Cox*, ¶ 23,786 at 34,067 (proof of causation requires the Division to show that "the respondents' conduct 'resulted in' artificial prices").

There can be multiple causes of an artificial price.  *DiPlacido*, ¶ 30,970, at 62,485.  The manipulator's actions need not be the sole cause of the artificial price.  "It is enough for purposes of a finding of manipulation in violation of Sections 6(b) and 9 of the Act that respondents' action contributed to the price [movement]."  *In re Kosuga*, 19 A.D. 603, 624 (1960).  *See also Cox* ¶ 23,786 at 34,066 (recognizing there can be multiple causes of an artificial price and holding that a charge of manipulation can be sustained where respondents' acts are a proximate cause of the artificial price).

Here, as a member of the BBA's Yen LIBOR panel, UBS made daily submissions that purported to reflect its assessments of the costs of borrowing unsecured funds in the London interbank market for Yen LIBOR across tenors.  The official LIBOR fixings are calculated using a trimmed average methodology applied to the rates submitted by the panel banks.  By virtue of this methodology, UBS had the ability to influence or affect the rate that would become the official Yen LIBOR for any tenor.

As evidenced by the extensive communications and other facts set forth above, in making the false Yen LIBOR submissions, several UBS Trader-Submitters and Derivatives Traders, in particular the Senior Yen Trader, specifically intended to affect the daily Yen LIBOR  for certain tenors, including one-month, three-month, six-month, and twelve-month.  Their intent is also made clear by the evidence that Derivatives Traders' and Trader-Submitters' motives were to

benefit UBS's derivatives trading position, or, at times, the derivatives trading positions of other panel banks with whom some UBS Derivatives Traders colluded.

On certain occasions, UBS's false, misleading or knowingly inaccurate Yen LIBOR submissions were illegitimate factors in the pricing of the daily Yen LIBOR fixings and affected the official Yen LIBOR for certain tenors, resulting in artificial Yen LIBOR fixings. Thus, UBS's actions were a proximate cause of the artificial Yen LIBOR fixings.

Accordingly, on certain occasions, UBS manipulated Yen LIBOR for certain tenors, a commodity in interstate commerce, in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act.

## C.   UBS Attempted to Manipulate LIBOR, Euribor and Euroyen TIBOR

To prove attempted manipulation, two elements are required: (1) an intent to affect the market price; and (2) an overt act in furtherance of that intent. *See In re Hohenberg Bros. Co.* [1975-77 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271 at 21,477 (CFTC Feb. 18, 1977); *CFTC v. Bradley*, 408 F. Supp. 2d 1214, 1220 (N.D. Okla. 2005). The intent standard is the same as that for manipulation. *See Indiana Farm Bureau* and *Hohenberg Bros.*, *supra*.

As with Yen LIBOR and as evidenced by the extensive communications, several UBS's Derivatives Traders and Trader-Submitters each specifically intended to affect the rate at which the daily LIBOR for Yen, Sterling, Swiss Franc and Euro, Euribor and Euroyen TIBOR would be fixed to benefit UBS's derivatives trading positions or to benefit the derivatives trading positions of colluding traders at other banks. The UBS Derivatives Traders' requests for certain rates to be submitted that would benefit their derivatives trading positions or the derivatives trading positions of traders at other banks, and the Trader-Submitters making submissions for LIBOR for Yen, Sterling, Swiss Franc and Euro, Euribor, and Euroyen TIBOR reflecting rates beneficial to UBS's derivatives trading positions, rather than reflecting, as required, UBS's assessments of the costs of borrowing unsecured funds, constitute overt acts in furtherance of their intent to affect the fixings of LIBOR for those currencies, Euribor and Euroyen TIBOR. By doing so, UBS engaged in repeated acts of attempted manipulation in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006).

## D.   Respondents Aided and Abetted the Attempts of Other Traders at Other Banks to Manipulate Yen LIBOR and Euroyen TIBOR

Pursuant to Section 13(a) of the Act, UBS aided and abetted the attempts of traders at other banks to manipulate Yen LIBOR and Euroyen TIBOR in violation of the Act. 7 U.S.C. 13c(a) (2006). Liability as an aider and abettor requires proof that: (1) the Act was violated; (2) the aider and abettor had knowledge of the wrongdoing underlying the violation; and (3) the aider and abettor intentionally assisted the primary wrongdoer. *See In re Nikkhah*, [1999-2000 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 28,129 at 49,888 n.28 (CFTC May 12, 2000). Although actual knowledge of the primary wrongdoer's conduct is required, knowledge of the unlawfulness of such conduct need not be demonstrated. *See In re Lincolnwood Commodities, Inc.*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶

21,986, at 28,255 (CFTC Jan. 31, 1984).  Knowing assistance can be inferred from the surrounding facts and circumstances.  *Id.*

As evidenced by the extensive communications, certain UBS Yen Derivatives Traders, primarily the Senior Yen Trader, and traders at other panel banks coordinated about Yen LIBOR and Euroyen TIBOR rates that would benefit their banks' respective derivatives trading positions.  At times, the traders at the other panel banks asked the UBS Yen Derivatives Traders to have the UBS Yen Trader-Submitters submit a certain rate, or submit a rate in a direction higher or lower, that would benefit the derivatives' positions of the traders at the other panel banks.  The UBS Yen Derivatives Traders agreed and made the requests of the UBS Yen Trader-Submitters, who in turn made their Yen LIBOR submissions based on the UBS Yen Derivatives Traders' requests.  Accordingly, by seeking to affect the rate at which LIBOR and Euroyen TIBOR were fixed, traders at other banks attempted to manipulate LIBOR and Euroyen TIBOR in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006).  Certain UBS Yen Derivatives Traders had knowledge of and intentionally assisted the attempts of the traders at the other banks to manipulate the rate at which LIBOR and Euroyen TIBOR were fixed.  By such acts of those UBS Yen Derivatives Traders, UBS aided and abetted the attempts of traders at other banks to manipulate LIBOR and Euroyen TIBOR in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006).

### E.    UBS AG and UBS Securities Japan Co., Ltd. Are Liable for the Acts of their Agents

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2012) provide that the act, omission, or failure of any official, agent or other person acting for any individual, association, partnership, corporation or trust within the scope of his employment or office shall be deemed the act, omission or failure of such individual, association, partnership, corporation or trust.  Pursuant to Section 2(a)(1)(B) of the CEA and Commission Regulation 1.2, strict liability is imposed on principals for the actions of their agents.  *See, e.g., Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986); *Dohmen-Ramirez & Wellington Advisory, Inc. v. CFTC*, 837 F.2d 847, 857-58 (9th Cir. 1988).

UBS AG and UBS Securities Japan Co., Ltd. are liable for the acts, omissions and failures of the traders, managers and submitters who acted as their employees and/or agents in the conduct described above.  UBS AG, which wholly owns UBS Securities Japan Co., Ltd., is liable for the acts, omissions and failures of UBS AG and UBS Securities Japan Co., Ltd. with respect to the conduct described above.  Accordingly, UBS AG and UBS Securities Japan Co., Ltd. violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006), as set forth above.

### V.

### FINDINGS OF VIOLATIONS

Based on the foregoing, the Commission finds that Respondents violated Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2) (2006).

### VI.

## OFFER OF SETTLEMENT

Respondents, without admitting or denying the findings or conclusions herein, except to the extent Respondents admit those findings in any related action against UBS by, or any agreement with, the Department of Justice or any other governmental agency or office, have submitted the Offer in which they:

A.  Acknowledge receipt of service of this Order;

B.  Admit the jurisdiction of the Commission with respect to all matters set forth in this Order and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

C.  Waive:

    1.  the filing and service of a complaint and notice of hearing;

    2.  a hearing;

    3.  all post-hearing procedures;

    4.  judicial review by any court;

    5.  any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer;

    6.  any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2006) and 28 U.S.C. § 2412 (2006), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Commission's Regulations, 17 C.F.R. §§ 148.1-30 (2012), relating to, or arising from, this proceeding;

    7.  any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-868 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this proceeding; and

    8.  any claims of Double Jeopardy based on the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief;

D.  Stipulate that the record basis on which this Order is entered shall consist solely of the findings contained in this Order to which Respondents have consented in the Offer; and

E.  Consent, solely on the basis of the Offer, to the Commission's entry of this Order that:

1.  makes findings by the Commission that Respondents violated Section 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2) (2006);

2.  orders Respondents to cease and desist from violating Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2) (2006 & Supp. V 2012);

3.  orders Respondents, jointly and severally, to pay a civil monetary penalty in the amount of $700,000,000, plus post-judgment interest; and

4.  orders Respondents and their successors and assigns to comply with the conditions and undertakings consented to in the Offer and as set forth in Part VII of this Order.

Upon consideration, the Commission has determined to accept the Offer.

## VII.

## ORDER

**Accordingly, IT IS HEREBY ORDERED THAT:**

A.  Respondents shall cease and desist from violating Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2) (2006 & Supp. V 2012).

B.  Respondents, jointly and severally, shall pay a civil monetary penalty of 700 Million U.S. Dollars ($700,000,000), within ten (10) days of the date of entry of this Order (the "CMP Obligation"). If the CMP Obligation is not paid in full within ten (10) days of the date of entry of this Order, then post judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2006). Respondents shall pay the CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables --- AMZ 340
> E-mail Box: 9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405) 954-5644

If payment is to be made by electronic funds transfer, Respondents shall contact Linda Zurhorst or her successor at the above address to receive payment instructions and shall fully comply with those instructions. Respondents shall accompany payment of the CMP Obligation with a cover letter that identifies the paying Respondent and the name and docket number of this proceeding. The paying Respondent shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

C.     Respondents and their successors and assigns shall comply with the following conditions and undertakings set forth in the Offer:

    1.  PRINCIPLES[31]

        i.  UBS agrees to undertake the following: (1) to ensure the integrity and reliability of its Benchmark Interest Rate Submission(s), presently and in the future; and (2) to identify, construct and promote effective methodologies and processes of setting Benchmark Interest Rates, in coordination with efforts by Benchmark Publishers, in order to ensure the integrity and reliability of Benchmark Interest Rates in the future.

        ii.  UBS represents and undertakes that each Benchmark Interest Rate Submission by UBS shall be based upon a rigorous and honest assessment of information, and shall not be influenced by internal or external conflicts of interest, or other factors or information extraneous to any rules applicable to the setting of a Benchmark Interest Rate.

---

[31]  The following terms are defined as follows:

**Benchmark Interest Rate**: An interest rate for a currency and maturity/tenor that is calculated based on data received from market participants and published to the market on a regular, periodic basis, such as LIBOR and Euribor;

**Benchmark Publisher**: A banking association or other entity that is responsible for or oversees the calculation and publication of a Benchmark Interest Rate;

**Submission(s)**: The interest rate(s) submitted for each currency and maturity/tenor to a Benchmark Publisher. For example, if UBS submits a rate for one month and three month U.S. Dollar LIBOR, that would constitute two Submissions;

**Submitter(s)**: The person(s) responsible for determining and/or transmitting the Submission(s); and

**Supervisor(s)**: The person(s) immediately and directly responsible for supervising any portion of the process of Submission(s) and/or any of the Submitter(s).

2. INTEGRITY AND RELIABILITY OF BENCHMARK INTEREST RATE
   SUBMISSIONS

   i. <u>DETERMINATION OF SUBMISSIONS</u>:  UBS shall determine its
      Submission(s) based on the following Factors, Adjustments and
      Considerations, unless otherwise prohibited by or contrary to an
      affirmative obligation imposed by any law or regulation, or the rules or
      definitions issued by a Benchmark Publisher.  UBS's transactions shall be
      given the greatest weight in determining its Submissions, subject to
      applying appropriate Adjustments and Considerations in order to reflect
      the market measured by the Benchmark Interest Rate.[32]

      UBS shall determine its Submissions as described in these Undertakings
      within fourteen (14) days of the entry of this Order.

      ▪ <u>Factor 1 — UBS's Borrowing or Lending Transactions Observed
         by UBS's Submitters</u>:

         a. UBS's transactions in the market as defined by the
            Benchmark Publisher for the particular Benchmark Interest
            Rate;

         b. UBS's transactions in other markets for unsecured funds,
            including, but not limited to, certificates of deposit and
            issuances of commercial paper; and

         c. UBS's transactions in various related markets, including,
            but not limited to, Overnight Index Swaps, foreign currency
            forwards, repurchase agreements, futures and Fed Funds.

      ▪ <u>Factor 2 — Third Party Transactions Observed by UBS's
         Submitters</u>:

         a. Transactions in the market as defined by the Benchmark
            Interest Rate relevant to each of the Submission(s);

         b. Transactions in other markets for unsecured funds,
            including, but not limited to, certificates of deposit and
            issuances of commercial paper; and

         c. Transactions in various related markets, including, but not
            limited to, Overnight Index Swaps, foreign currency
            forwards, repurchase agreements, futures, and Fed Funds.

---

[32]   The rules used by Benchmark Publishers to determine Benchmark Interest Rates vary, may not be
consistent with each other, and provide different levels of guidance as to how to make Submissions.

61

- Factor 3 — Third Party Offers Observed by UBS's Submitters:

  a. Third party offers to UBS in the market as defined by the Benchmark Publisher relevant to each of the Submission(s);

  b. Third party offers in other markets for unsecured funds, including, but not limited to, certificates of deposit and issuances of commercial paper, provided to UBS by interdealer brokers (*e.g.,* brokers); and

  c. Third party offers provided to UBS in various related markets, including, but not limited to, Overnight Index Swaps, foreign currency forwards, repurchase agreements, and Fed Funds.

- Adjustments and Considerations:  All of the following Adjustments and Considerations may be applied with respect to each of the Factors above:

  a. Time:  With respect to the Factors considered above, proximity in time to the Submission(s) increases the relevance of that Factor;

  b. Market Events:  UBS may adjust its Submission(s) based upon market events, including price variations in related markets, that occur prior to the time at which the Submission(s) must be made to the Benchmark Publisher. That adjustment shall reflect measurable effects on transacted rates, offers or bids;

  c. Term Structure:  As UBS applies the above Factors, if UBS has data for any maturity/tenor described by a Factor, then UBS may interpolate or extrapolate the remaining maturities/tenors from the available data;

  d. Credit Standards:  As UBS applies the above Factors, adjustments may be made to reflect UBS's credit standing and/or the credit spread between the market as defined by the Benchmark Publisher and transactions or offers in the related markets used in the Factors above.  Additionally, UBS may take into account counterparties' credit standings, access to funds, and borrowing or lending requirements, and third party offers considered in connection with the above Factors; and

62

    e.  <u>Non-representative Transactions</u>:  To the extent a transaction included among the Factors above significantly diverges in an objective manner from other transactions, and that divergence is not due to market events as addressed above, UBS may exclude such transactions from its determination of its Submission(s).

ii.  <u>SUPERVISOR(S) REVIEW</u>:  Effective within fourteen (14) days of the entry of this Order, each daily Submission shall be reviewed by a Supervisor on a daily basis after the Submission(s) are made to the Benchmark Publisher.

iii.  <u>QUALIFICATIONS OF SUBMITTER(S) AND SUPERVISOR(S)</u>:  All Submitter(s) shall have significant experience in the markets for the Benchmark Interest Rate to which they are submitting or a comparable market, but may designate less experienced parties, who routinely work under their supervision, to make Submission(s) during limited periods of absence.  All Supervisors shall have significant experience in the markets for the relevant Benchmark Interest Rate or a comparable market. Submitters, Supervisors and any parties designated to make Submission(s) when the Submitter(s) are absent shall not be assigned to any derivatives trading desk, unit or division within UBS, or participate in derivatives trading other than that associated with UBS's liquidity and liability management.  The compensation of Submitter(s) and Supervisor(s) also shall not be directly based upon derivatives trading, other than that associated with UBS's liquidity and liability management.

iv.  <u>FIREWALLS: INTERNAL CONTROLS REGARDING IMPROPER COMMUNICATIONS AND SUBMISSIONS</u>:  UBS shall implement internal controls and procedures to prevent improper communications with Submitter(s) and Supervisor(s) regarding Submission(s) or prospective Submission(s) to ensure the integrity and reliability of its Submission(s). Such internal controls and procedures shall include, but not be limited to:

- The "firewalls" contemplated herein will be implemented through written policies and procedures that delineate proper and improper communications with Submitter(s) and Supervisor(s), whether internal or external to UBS.  For these purposes, improper communications shall be any attempt to influence UBS's Submission(s) for the benefit of any derivatives trading position (whether of UBS or any third party) or any attempt to cause UBS's Submitter(s) to violate any applicable Benchmark Publisher's rules or definitions, or Section 2 of these Undertakings; and

- A requirement that the Submitter(s) shall not be located in close proximity to traders who primarily deal in derivatives products that

reference a Benchmark Interest Rate to which UBS contributes any Submission(s). The two groups should be separated such that neither can hear the other.

v. <u>DOCUMENTATION</u>: UBS shall provide the documents set forth below promptly and directly to the Commission upon request, without subpoena or other process, regardless of whether the records are held outside of the United States, to the extent permitted by law.

- For each Submission, UBS shall contemporaneously memorialize, and retain in an easily accessible format for a period of five (5) years after the date of each Submission, the following information:

  a. The Factors, Adjustments and Considerations described in Section 2(i) above that UBS used to determine its Submission(s), including, but not limited to, identifying any non-representative transactions excluded from the determination of the Submission(s) and the basis for such exclusions, as well as identifying all transactions given the greatest weight or considered to be the most relevant, and the basis for such conclusion;

  b. All models or other methods used in determining UBS's Submission(s), such as models for credit standards and/or term structure, and any adjustments made to the Submission(s) based on such models or other methods;

  c. Relevant data and information received from interdealer brokers used in connection with determining UBS's Submission(s) including, but not limited to, the following:

    • Identification of the specific offers and bids relied upon by UBS when determining each Submission; and

    • The name of each company and person from whom the information or data is obtained;

  d. UBS's assessment of "reasonable market size" for its Submission(s) (or any other such criteria for the relevancy of transactions to a Benchmark Interest Rate), to the extent that the rules for a Benchmark Interest Rate require that pertinent transactions considered in connection with Submission(s) be of "reasonable market size" (or any other such criteria);

64

  e. Information regarding market events considered by UBS in connection with determining its Submission(s), including, without limitation, the following:

    • The specific market announcement(s) or event(s); and

    • Any effect of such market event(s) on transacted rates, offers or bids in the relevant markets; and

  f. The identity of the Submitter(s) who made, and the Supervisor(s) who reviewed, the Submission(s).

▪ For each Submission, UBS shall retain for a period of five (5) years after the date of each Submission, the following transactional data used by UBS to determine its Submission(s); the data shall be easily accessible and convertible into the Microsoft Excel file format; the data shall include, without limitation, the following to the extent known to UBS at the time of the Submission(s):

  a. Instrument;
  b. Maturity/tenor;
  c. Trade type (*i.e.*, loan/deposit, placing/taking);
  d. Buy/sell indicator;
  e. Transaction date (in mmddyyyy format);
  f. Maturity date (in mmddyyyy format);
  g. Value date (in mmddyyyy format);
  h. Loan effective date;
  i. Customer number;
  j. Currency;
  k. Ticket ID;
  l. Timestamp;
  m. Counterparty A (buyer/bidder);
  n. Counterparty B (seller/offeror);
  o. Nominal/notional size of the transaction;
  p. Interest basis (360/365 day year);
  q. The fixed interest rate; and
  r. Any special or additional terms (*e.g.*, a repurchase agreement or some form of "non-vanilla agreement").

▪ <u>Transaction Records</u>: UBS shall retain for a period of five (5) years trade transaction records and daily position and risk reports, including (without limitation) monthly and quarterly position and risk reports, related to the trading activities of Submitter(s) and traders who primarily deal in derivatives products that reference a

Benchmark Interest Rate; the records and reports shall be easily accessible and convertible into the Microsoft Excel file format.

- Requirement To Record Communications: UBS shall record and retain to the greatest extent practicable all of the following communications:

    a. All communications concerning the determination and review of the Submission(s); and

    b. All communications of traders who primarily deal in derivatives products that reference a Benchmark Interest Rate concerning trades, transactions, prices, or trading strategies pertaining to any derivative that references any Benchmark Interest Rate (or the supervision thereof).

The above communications shall not be conducted in a manner to prevent UBS from recording such communications;

Audio communications of Submitters and Supervisors shall be retained for a period of one (1) year. Audio communications of traders who primarily deal in derivatives products that reference a Benchmark Interest Rate, and who are located at least in the London, Zurich, Tokyo, and Stamford, Connecticut office of UBS, shall be retained for a period of six (6) months. Subject to a reasonable time to implement, UBS's audio retention requirements pursuant to these Undertakings shall commence within a reasonable period after the entry of this Order and shall continue for a period of five (5) years thereafter;

All communications except audio communications shall be retained for a period of five (5) years; and

Nothing in these Undertakings shall limit, restrict or narrow any obligations pursuant to the Act or the Commission's Regulations promulgated thereunder, including but not limited to Regulations 1.31 and 1.35, 17 C.F.R. §§ 1.31 and 1.35 (2012), in effect now or in the future.

vi. MONITORING AND AUDITING:

- Monitoring: UBS shall maintain or develop monitoring systems or electronic exception reporting systems that identify possible improper or unsubstantiated Submissions. Such reports will be reviewed on at least a weekly basis and, if there is any significant deviation or issues, the underlying documentation for the Submission shall be reviewed to determine whether the

66

Submission is adequately substantiated.  If it is not substantiated, UBS shall notify its chief compliance officer(s) and the Benchmark Publisher;

▪ <u>Periodic Audits</u>:  Starting six (6) months from the date of the entry of this Order and continuing every six (6) months thereafter, unless an annual audit is scheduled at the same time, UBS shall conduct internal audits of reasonable and random samples of its Submission(s), the factors and all other evidence documenting the basis for such Submission(s), and communications of the Submitter(s) in order to verify the integrity and reliability of the process for determining Submission(s); and

▪ <u>Annual Audits By Third Party Auditors</u>:  Starting one (1) year from the date of the entry of this Order and continuing annually for four (4) additional years thereafter, UBS shall retain an independent, third-party auditor to conduct an audit of its Submission(s) and the process for determining Submission(s), which shall include, without limitation, the following:

    a.  Reviewing communications of Submitter(s) and Supervisor(s);

    b.  Interviewing the Submitter(s) and Supervisor(s), to the extent they are still employed by UBS;

    c.  Obtaining written verification from the Submitter(s) and Supervisor(s), to the extent they are still employed by UBS, that the Submission(s) were consistent with this Order, the policies and procedures in place for making UBS's Submission(s), and the definitions applicable to the Benchmark Interest Rate for which UBS made Submission(s); and

    d.  A written audit report to be provided to UBS and the Commission (with copies addressed to the Commission's Division of Enforcement (the "Division")).

vii.  <u>POLICIES, PROCEDURES AND CONTROLS</u>:  Within sixty (60) days of the entry of this Order, UBS shall develop policies, procedures and controls to comply with each of the specific Undertakings set forth above with the goal of ensuring the integrity and reliability of its Submission(s). In addition, UBS shall develop policies, procedures and controls to ensure the following:

▪ The supervision of the Submission process;

67

- That any violations of the Undertakings or any questionable, unusual or unlawful activity concerning UBS's Submissions are reported to and investigated by UBS's compliance or legal personnel and reported, as necessary, to authorities and the Benchmark Publishers;

- The periodic but routine review of electronic communications and audio recordings of or relating to the Submission Process;

- The periodic physical presence of compliance personnel on the trading floors of the Submitter(s) and/or traders who primarily deal in derivatives products that reference a Benchmark Interest Rate to observe and ensure compliance with these Policies, Procedures and Controls, which shall be conducted not less than monthly;

- The handling of complaints concerning the accuracy or integrity of UBS's Submission(s) including:

    a. Memorializing all such complaints;

    b. Review and follow-up by the chief compliance officer(s) or his designee of such complaints; and

- The reporting of material complaints to the Chief Executive Officer and Board of Directors, relevant self-regulatory organizations, the relevant Benchmark Publisher, the Commission, and/or other appropriate regulators.

viii. TRAINING:  UBS shall develop training programs for all employees who are involved in its Submission(s), including, without limitation, Submitters and Supervisors, and all traders who primarily deal in derivatives products that reference a Benchmark Interest Rate.  Submitters and Supervisors shall be provided with preliminary training regarding the policies, procedures and controls developed pursuant to Section 2(vii) of these Undertakings.  By no later than September 20, 2013, all Submitters, Supervisors and traders who primarily deal in derivatives products that reference a Benchmark Interest Rate shall be fully trained in the application of these Undertakings to them, as set forth herein.  Thereafter, such training will be provided promptly to employees newly assigned to any of the above listed responsibilities, and again to all Submitters, Supervisors and traders who primarily deal in derivatives products that reference a Benchmark Interest Rate as part of UBS's regular training programs.  The training shall be based upon the individual's position and responsibilities, and as appropriate, address the following topics:

- The Undertakings set forth herein;

68

- The process of making Submission(s);

- The impropriety of attempting to influence the determination of UBS's Submission(s);

- The requirement to conduct all business related to UBS's Submission(s) on UBS's recorded telephone and electronic communications systems, and not on personal telephones or other electronic devices, as set forth in Section 2(v) of these Undertakings;

- The requirement to conduct certain business related to derivatives products that reference a Benchmark Interest Rate on UBS's recorded telephone and electronic communications systems, and not on personal devices or systems, as set forth in Section 2(v) of these Undertakings;

- The policies and procedures developed and instituted pursuant to these Undertakings; and

- The employment and other potential consequences if employees act unlawfully or improperly in connection with UBS's Submission(s) or process for determining Submission(s).

ix.  REPORTS TO THE COMMISSION:

- Compliance with Undertakings:  Every four (4) months, starting 120 days from the entry of this Order, UBS shall make interim reports to the Commission, through the Division, explaining its progress towards compliance with the Undertakings set forth herein.  Within 365 days of the entry of this Order, UBS shall submit a report to the Commission, through the Division, explaining how it has complied with the Undertakings set forth herein.  The report shall attach copies of and describe the internal controls, policies and procedures that have been designed and implemented to satisfy the Undertakings.  The report shall contain a certification from a representative of UBS's Executive Management, after consultation with UBS's chief compliance officer(s), that UBS has complied with the Undertakings set forth above, and that it has established policies, procedures and controls to satisfy the Undertakings set forth in the Order;

- Submitter(s), Supervisor(s), and Heads of Appropriate Trading Desks:  Within fourteen (14) days of the entry of this Order, or as soon as practicable thereafter, UBS shall provide, meet with and explain these Undertakings to all Submitters, Supervisors and the head of each trading desk that primarily deals in derivatives that

69

reference a Benchmark Interest Rate.  Within that same time frame, UBS shall provide to the Commission, through the Division, written or electronic affirmations signed by each Submitter, Supervisor, and head of each trading desk that primarily deals in derivatives that reference a Benchmark Interest Rate, stating that he or she has received and read the Order and Undertakings herein, and that he or she understands these Undertakings to be effective immediately; and

▪ Disciplinary and Other Actions:  UBS shall promptly report to the Commission, through the Division, all improper conduct related to any Submission(s) or the attempted manipulation or manipulation of a Benchmark Interest Rate, as well as any disciplinary action, or other law enforcement or regulatory action related thereto, unless *de minimis* or otherwise prohibited by applicable laws or regulations.

3.  DEVELOPMENT OF RIGOROUS STANDARDS FOR BENCHMARK INTEREST RATES

To the extent UBS is or remains a contributor to any Benchmark Interest Rate, UBS agrees to make its best efforts to participate in efforts by current and future Benchmark Publishers, other price reporting entities and/or regulators to ensure the reliability of Benchmark Interest Rates, and through its participation to encourage the following:

i.  METHODOLOGY:  Creating rigorous methodologies for the contributing panel members to formulate their Submissions.  The aim of such methodologies should be to result in a Benchmark Interest Rate that accurately reflects the rates at which transactions are occurring in the market being measured by that Benchmark Interest Rate;

ii.  VERIFICATION:  Enforcing the use of those methodologies through an effective regime of documentation, monitoring, supervision and auditing, required by and performed by the Benchmark Publishers, and by the contributing panel members internally;

iii.  INVESTIGATION:  Facilitating the reporting of complaints and concerns regarding the accuracy or integrity of Submissions to Benchmark Interest Rates or the published Benchmark Interest Rate, and investigating those complaints and concerns thoroughly;

iv.  DISCIPLINE:  Taking appropriate action if, following a thorough confidential investigation, the Benchmark Publisher determines that a complaint or concern regarding the accuracy or integrity of a Submission or the published Benchmark Interest Rate has been substantiated;

v.   TRANSPARENCY:  Making regular reports to the public and the markets of facts relevant to the integrity and reliability of each Benchmark Interest Rate.  Such reports should include, but not be limited to, the following:

- At the time each Benchmark Interest Rate is published, the Benchmark Publisher should display prominently whether each rate is based entirely on transactions in the market the rate is supposed to reflect, or whether it instead is based, in whole or in part, on other data or information;

- The Benchmark Publisher also should make periodic reports regarding the number and nature of complaints and concerns received regarding the accuracy or integrity of Submissions or the published Benchmark Interest Rate while maintaining the anonymity of all those who have reported or are the subject of complaints and concerns;

- The Benchmark Publisher should additionally make periodic reports regarding the results of all investigations into such complaints and concerns while maintaining the anonymity of all those involved in investigations that have not yet been completed; and

vi.   FORMULATION:  Periodically examining whether each Benchmark Interest Rate accurately reflects the rate at which transactions are occurring in the market being measured (using the statistical method prescribed by that Benchmark Interest Rate), and evaluating whether the definition and instructions should be revised, or the composition of the panel changed;

Such examinations should include a rigorous mathematical comparison of transactions in the relevant market with the published Benchmark Interest Rate on the same day over a specified period, and a determination of whether any differences are statistically or commercially significant.

UBS shall report periodically, on at least a quarterly basis, to the Commission, through the Division, either orally or in writing, on its participation in such efforts, to the extent that such reporting is not otherwise prohibited by law or regulations, by the rules issued by Benchmark Publishers, or by nondisclosure agreements by and between UBS and Benchmark Publishers.

4.   COOPERATION WITH THE COMMISSION

i.   Respondents shall cooperate fully and expeditiously with the Commission, including the Division, and any other governmental agency in this action, and in any investigation, civil litigation, or administrative matter related to the subject matter of this action or any current or future Commission

71

investigation related thereto.  As part of such cooperation, Respondents agree to the following for a period of five (5) years from the date of the entry of this Order, or until all related investigations and litigation are concluded, including through the appellate review process, whichever period is longer:

- Preserve all records relating to the subject matter of this proceeding, including, but not limited to, audio files, electronic mail, other documented communications, and trading records;

- Comply fully, promptly, completely, and truthfully with all inquiries and requests for information or documents;

- Provide authentication of documents and other evidentiary material;

- Provide copies of documents within UBS's possession, custody or control;

- Subject to applicable laws and regulations, UBS will make its best efforts to produce any current (as of the time of the request) officer, director, employee, or agent of UBS, regardless of the individual's location, and at such location that minimizes Commission travel expenditures, to provide assistance at any trial, proceeding, or Commission investigation related to the subject matter of this proceeding, including, but not limited to, requests for testimony, depositions, and/or interviews, and to encourage them to testify completely and truthfully in any such proceeding, trial, or investigation; and

- Subject to applicable laws and regulations, UBS will make its best efforts to assist in locating and contacting any prior (as of the time of the request) officer, director, employee or agent of UBS;

ii.   UBS also agrees that it will not undertake any act that would limit its ability to cooperate fully with the Commission.  UBS will designate an agent located in the United States of America to receive all requests for information pursuant to these Undertakings, and shall provide notice regarding the identity of such agent to the Division upon entry of this Order.  Should UBS seek to change the designated agent to receive such requests, notice of such intention shall be given to the Division fourteen (14) days before it occurs.  Any person designated to receive such request shall be located in the United States of America; and

iii.  UBS and the Commission agree that nothing in these Undertakings shall be construed so as to compel UBS to continue to contribute Submission(s)

72

related to any Benchmark Interest Rate. Without prior consultation with the Commission, UBS remains free to withdraw from the panel of contributors to any Benchmark Interest Rate.

5. PROHIBITED OR CONFLICTING UNDERTAKINGS

Should the Undertakings herein be prohibited by, or be contrary to the provisions of any obligations imposed on UBS by any presently existing, or hereinafter enacted or promulgated laws, regulations, regulatory mandates, or the rules or definitions issued by a Benchmark Publisher, then UBS shall promptly transmit notice to the Commission (through the Division) of such prohibition or conflict, and shall meet and confer in good faith with the Commission (through the Division) to reach an agreement regarding possible modifications to the Undertakings herein sufficient to resolve such inconsistent obligations. In the interim, UBS will abide by the obligations imposed by the law, regulations, regulatory mandates and Benchmark Publishers' rules and definitions. Nothing in these Undertakings shall limit, restrict or narrow any obligations pursuant to the Act or the Commission's Regulations promulgated thereunder, including, but not limited to, Regulations 1.31 and 1.35, 17 C.F.R. §§ 1.31 and 1.35 (2012), in effect now or in the future.

6. PUBLIC STATEMENTS

Respondents agree that neither they nor any of their successors and assigns, agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in this Order or creating, or tending to create, the impression that this Order is without a factual basis; provided, however, that nothing in this provision shall affect Respondents' (i) testimonial obligations, or (ii) right to take positions in other proceedings to which the Commission is not a party. Respondents and their successors and assigns shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement.

D. Partial Satisfaction: Respondents understand and agree that any acceptance by the Commission of partial payment of Respondents' CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

**The provisions of this Order shall be effective as of this date.**

By the Commission.

Sauntia S. Warfield
Assistant Secretary of the Commission
Commodity Futures Trading Commission

Dated:  December 19 , 2012